The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
September 8, 2022

## 2022COA102

**No. 19CA2033, *People v. Sellers* — Crimes — Felony Murder; Criminal Law — Sentencing — Presumption of Concurrence — Life Imprisonment Without the Possibility of Parole; Constitutional Law — Eighth Amendment — Cruel and Unusual Punishments — Proportionality Review — Per Se Grave or Serious Offenses**

A division of the court of appeals addresses three issues of first impression, holding that (1) when a court imposes sentence on multiple counts contemporaneously, and the court's pronouncement is silent or ambiguous as to whether the sentences are concurrent or consecutive, the sentences are presumed to be concurrent; (2) a sentence of life without the possibility of parole for the crime of felony murder is not categorically unconstitutional; and (3) felony murder is a per se grave or serious offense for purposes of an abbreviated proportionality review.

COLORADO COURT OF APPEALS                                    2022COA102

Court of Appeals No. 19CA2033
El Paso County District Court No. 18CR6275
Honorable Lin Billings Vela, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Wayne Tc Sellers IV,

Defendant-Appellant.

JUDGMENT AFFIRMED, SENTENCE AFFIRMED IN PART,
VACATED IN PART, AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE TOW
Dailey and Hawthorne*, JJ., concur

Announced September 8, 2022

Philip J. Weiser, Attorney General, Katharine J. Gillespie, Assistant Attorney
General, Carson D. Schneider, Assistant Attorney General Fellow, Denver,
Colorado, for Plaintiff-Appellee

Krista A. Schelhaas, Alternate Defense Counsel, Littleton, Colorado, for
Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2021.

¶ 1     Defendant, Wayne Tc Sellers IV, and several companions robbed two drug dealers at gunpoint.  One of Sellers's companions shot and killed the second victim.  A jury convicted Sellers of five charges related to the victim who was killed: felony murder, three counts of attempted aggravated robbery, and conspiracy to commit aggravated robbery.  The jury also convicted Sellers of aggravated robbery related to the other victim.

¶ 2     Sellers appeals his conviction and also challenges his sentence.  We affirm his conviction and his sentence for felony murder but vacate his consecutive sentence for aggravated robbery.  In addressing the challenges to his sentence, we address three issues of first impression: (1) we reject his categorical attack on his sentence to life without the possibility of parole for felony murder; (2) we conclude that felony murder is a per se grave or serious offense for purposes of an abbreviated proportionality review; and (3) we hold that where the trial court does not specify whether a defendant's contemporaneously announced sentences are to be concurrent with or consecutive to one another, they are presumed to run concurrently.

## I.    Sellers's Attacks on His Conviction

¶ 3    Sellers raises two challenges to his conviction.  He argues that the trial court erred by denying his motion to suppress statements he made to a detective.  And he contends that the prosecutor engaged in misconduct warranting reversal.  We address, and reject, each contention.

### A.    Motion to Suppress

¶ 4    According to the testimony at the motions hearing, El Paso County Detective Jason Darbyshire, who had located Sellers in Holyoke, Colorado, arrested Sellers with the assistance of local law enforcement officers.  Before Sellers was taken to the Phillips County Sheriff's Office, Darbyshire told him,

> You are under arrest currently for an active warrant for first degree murder.  Okay.  Uh, basically, what I want to tell you is I would like to give you an opportunity to get your version of events out there; speak with you; see what went down.  Okay?  Obviously, I've got a lot of information 'cause that's why I'm here talking to you.  But, it's up to you, if you don't want to talk to me then, then that's your right to.  But if you do want to speak then we can go back to their police station we can have a chat and maybe iron a couple of things out.

2

Darbyshire asked Sellers what he wanted to do, and Sellers replied,

"[U]h, which would be better?" Darbyshire responded,

> Well, I mean, it's totally up to you man. Okay.
> You are under arrest either way. Okay. So
> there's a lot of. Before we can talk about the
> specifics of the case there's a lot of
> administrative parts and stuff that we've got to
> cover and a lot of legal stuff that you need to
> be aware of. Okay? So, do you think that is
> something you would like to do is make a
> statement in reference to this case? Or, is that
> not something you would like to do?

¶ 5     Sellers answered, "It is." Darbyshire then explained to him

that he would be transported to the Phillips County Sheriff's Office

to "hopefully get some things squared out."

¶ 6     At the sheriff's office, Darbyshire read Sellers his *Miranda*

rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966).[1] After reading

---

[1] The *Miranda* advisement was as follows:

> There are certain constitutional rights that are
> afforded to you. You've probably heard it a
> million times in television, movies, whatever,
> but I'm going to explain those to you now.
> Okay. Just so we're on the same page. You do
> have the right to remain silent. Anything you
> say can and will be used against you in a court
> of law. You have the right to hire an attorney
> and have him or her present during any
> questioning if you wish. If you cannot afford to

3

Sellers his rights, Darbyshire asked him, "[D]o you understand those rights as I've explained them to you?" Sellers said, "Yes." Darbyshire then confirmed that Sellers still wished to speak with him. Sellers, again, said yes.

¶ 7 The questioning, which was video-recorded, took place shortly after midnight and lasted ninety minutes. Sellers gave his version of the events, answered Darbyshire's questions, and even drew pictures to help illustrate certain scenes from the robberies.

¶ 8 Before trial, Sellers moved to suppress the initial audio-recorded police stop and the video-recorded interview at the sheriff's office. The trial court denied the motion as to both recordings. At trial, only the video-recorded interview was admitted.

### 1. Standard of Review

¶ 9 When reviewing a suppression order, we defer to the trial court's factual findings if they are supported by competent evidence in the record. *Verigan v. People*, 2018 CO 53, ¶ 18. However,

---

hire an attorney, one will be appointed to represent you before any questioning if you decide to do that route. You can decide at any time not to make any statements or answer any questions.

"[w]hen the interrogation is audio or video-recorded, and there are no disputed facts outside the recording pertinent to the suppression issue, we are in the same position as the trial court in determining whether the statements should or should not be suppressed under the totality of the circumstances." *People v. Ramadon*, 2013 CO 68, ¶ 21. In that case, we review de novo the legal effect of those facts. *People v. Liggett*, 2014 CO 72, ¶ 19.

### 2. Analysis

¶ 10      We disagree with Sellers's contention that his waiver of his *Miranda* rights was not voluntary, intelligent, and knowing.

¶ 11      "A waiver of *Miranda* rights is involuntary 'only if coercive governmental conduct — whether physical or psychological — played a significant role in inducing the defendant to make the confession or statement.'" *People v. Jiminez*, 863 P.2d 981, 984 (Colo. 1993) (quoting *People v. May*, 859 P.2d 879, 883 (Colo. 1993)). We look to the totality of the circumstances to determine whether an interrogation was coercive and consider the following nonexclusive factors:

- whether the defendant was in custody;
- whether the defendant was free to leave;

5

- whether the defendant was aware of the situation;

- whether the police read *Miranda* rights to the defendant;

- whether the defendant understood and waived *Miranda* rights;

- whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

- whether the statement was made during the interrogation or volunteered later;

- whether the police threatened the defendant or promised anything expressly or impliedly;

- the method of the interrogation;

- the defendant's mental and physical condition just prior to the interrogation;

- the length of the interrogation;

- the location of the interrogation; and

- the physical conditions of the location where the interrogation occurred.

*People v. Zadran*, 2013 CO 69M, ¶ 11.

¶ 12     We disagree with Sellers that his waiver was invalid because he was encouraged to speak before being read his *Miranda* rights. Rather, Darbyshire told Sellers twice that he was giving him the option to tell his version of the events.  Darbyshire also said, "[I]f you don't want to talk to me then, then that's your right to" and "it's totally up to you man."  Moreover, Darbyshire needed to know where to take Sellers: if Sellers wished to talk, he would be taken to the sheriff's office for questioning; if not, he would be taken to the jail for booking.  None of these statements encouraged Sellers to speak; they merely gave Sellers the option to do so.

¶ 13     We further disagree with Sellers that the following statements made by Darbyshire were improper promises that induced him to speak:

- "I kinda just want to give you a chance to explain what happened and how all that went down just so I have a clear picture of how everything transpired."

- "Here's the deal, I know you don't know me, but I mean this isn't an act.  I'm a [sic] shoot straight with you and if stuff is not good news, I'll tell you it's not good news."

- "I'm going to make sure that you get a fair shake as well."

These statements are not promises and were not coercive. *See id.* at ¶ 19 (concluding that the statement made by an officer that "it would be in [the defendant's] best interest" to speak was not coercive).

¶ 14    And we disagree with Sellers that his experience in the army, where soldiers are expected to answer questions in a command-heavy environment, influenced him to waive his *Miranda* rights.[2]  First, we note that there is no evidence that Darbyshire was aware of Sellers's military background or attempted in any way to take advantage of it. *See People v. Cisneros*, 2014 COA 49, ¶ 84 ("[A] defendant's weakened mental condition, in the absence of deliberate exploitation and intimidation by law enforcement officers, is insufficient to render the defendant's statements involuntary."). In any event, the trial court noted that Sellers was only in the military for two years.  And he was discharged for underage

---

[2] At the motions hearing, Sellers provided expert testimony explaining the impact his military service had on his ability to consent for an interview.

drinking after being pulled over for driving under the influence. Based on these facts, the trial court concluded, with record support, that Sellers's military background and experience did not impact the voluntariness of his waiver.

¶ 15     Lastly, we disagree with Sellers's emphasis that his age — twenty years old — contributed to him believing he had no choice but to speak with Darbyshire.  *See People v. Kaiser*, 32 P.3d 480, 484 (Colo. 2001) (holding that age is another factor for courts to consider in analyzing whether a *Miranda* waiver is valid); *Fare v. Michael C.*, 442 U.S. 707, 726-28 (1979) (noting that even juveniles can validly waive their *Miranda* rights).

¶ 16     Under the totality of the circumstances, Darbyshire's behavior did not overbear Sellers's will and, therefore, we conclude that Sellers's waiver and his subsequent statements were voluntary.  *See Zadran*, ¶ 10.

¶ 17     Next, we disagree with Sellers that his waiver was not knowing and intelligent because he was intoxicated and not properly advised of his *Miranda* rights.

¶ 18     A waiver must be made with full awareness regarding the nature of the rights being abandoned and the consequences of

9

abandoning them. *See Jiminez*, 863 P.2d at 984. "[I]ntoxication only invalidates an otherwise valid *Miranda* waiver if the court finds by a preponderance of the evidence that the defendant was so intoxicated as to be incapable of understanding the nature of his or her rights and the ramifications of waiving them." *People v. Bryant*, 2018 COA 53, ¶ 38. Sellers self-reported that he used marijuana two hours before the interrogation and cocaine nearly five hours before the interrogation. However, Sellers was not so intoxicated that he did not understand his rights and the consequences of waiving them. *See id.* Rather, as is clear from the video recording, Sellers was coherent, alert, and responsive during the interrogation.

¶ 19    We also disagree with Sellers that the *Miranda* advisement was insufficient because Darbyshire emphasized the word "hire," did not say that an appointed attorney would be free, did not pause to ask Sellers if he understood each sentence, and read the advisement quickly and in a casual tone.

¶ 20    When officers inform suspects of their rights, the rights need not be rigidly expressed exactly as described in *Miranda*. *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989). Rather, the warning needs to reasonably convey to the suspect their rights as

10

required by *Miranda*. *Id.* at 203; *see Sanchez v. People*, 2014 CO 56, ¶¶ 16-17 (noting that *Miranda* advisements do not need to include terms like "free of charge"). When Darbyshire told Sellers that if he could not "afford to hire an attorney, one [would] be appointed to represent [him] before any questioning," he clearly communicated that an appointed attorney is free.[3] Further, Darbyshire also emphasized that Sellers could "decide at any time not to make any statements or answer any questions." Finally, we are aware of no Colorado case law — and Sellers points us to none — requiring an officer to pause after each advisement to ask whether the suspect understood it. Thus, we conclude that Darbyshire reasonably conveyed Sellers's rights to him.

¶ 21    In sum, Sellers voluntarily, intelligently, and knowingly waived his rights. And his statements during the interrogation were voluntary. Thus, the trial court did not err by denying the motion to suppress.

---

[3] Contrary to Sellers's argument, Darbyshire's vocal emphasis on the word "hire" actually drew a clear distinction between Sellers's right to *hire* an attorney and, if he could not afford one, his right to have an attorney *appointed* to represent him.

## B. Prosecutorial Misconduct

¶ 22    We also disagree with Sellers that the prosecutor committed misconduct in opening statement and closing statement by improperly (1) expressing a personal opinion about Sellers's guilt, and (2) vouching for the credibility of witnesses.

### 1. Standard of Review

¶ 23    We determine whether a prosecutor's conduct was improper based on the totality of the circumstances. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). In doing so, we evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury. *People v. Conyac*, 2014 COA 8M, ¶ 132.

### 2. Analysis

¶ 24    We disagree with Sellers that the prosecutor expressed her personal opinion about his guilt during opening and closing statements by repeating that he "knew what he was doing." In the prosecutor's opening statement, she used this phrase to preview the evidence that she planned to introduce at trial and drew a reasonable inference from that evidence — that Sellers was a knowing participant in the offenses. *See People v. Samson*, 2012

12

COA 167, ¶ 31 (Prosecutors may "employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance."). Similarly, during her closing argument the prosecutor used this same phrase to summarize the evidence presented and to draw the same reasonable inference from that evidence. *See id.* ("Prosecutors may comment on the evidence admitted at trial and the reasonable inferences that can be drawn therefrom."). Contrary to Sellers's argument, nothing in the prosecutor's theme in any way expressed the prosecutor's personal beliefs.

¶ 25    Nor did the prosecutor express her personal opinion about Sellers's guilt when, in closing argument, she said that "the defendant[] is absolutely guilty of all the crimes we've charged" him with. "Whether a statement improperly expresses the personal opinion of a prosecutor . . . requires a reviewing court to consider the language used, the context in which the statement was made, and any other relevant factors." *Domingo-Gomez v. People*, 125 P.3d 1043, 1051 (Colo. 2005).

¶ 26    The prosecutor was prefacing her argument that the evidence contradicted Sellers's abandonment theory and was emphasizing the lack of evidence to support such a theory. *See People v.*

13

*Denhartog*, 2019 COA 23, ¶ 55 (noting that a prosecutor's comments in direct response to defense arguments were not prejudicial misconduct); *cf. People v. Esquivel-Alaniz*, 985 P.2d 22, 23 (Colo. App. 1999) ("[C]omment on the lack of evidence confirming a defendant's theory of the case is permissible . . . ."). Further, the prosecutor's statement was not preceded by an assertion of personal belief. *See Samson*, ¶¶ 33, 38 (perceiving no prosecutorial misconduct where prosecutor's statements that "[t]he defendant is guilty" and "[h]e did this" were not preceded by a phrase like "I believe"). Indeed, a prosecutor would effectively be prohibited from arguing their case if they could not even express that the admitted evidence was sufficient to convict the defendant. *See People v. Merchant*, 983 P.2d 108, 115 (Colo. App. 1999) (concluding that prosecutor's comment "that the '[defendant's] guilty of the crime of theft,' merely expressed the proposition that the evidence was sufficient to sustain a conviction" and was proper) (alteration in original).

¶ 27     Similarly, when viewed in context, the prosecutor's statement during rebuttal that "[w]e believe we met our burden" was not improper. She made this statement while discussing a question on

14

the jury verdict form that the jurors would only reach if they first found that the prosecution had met its burden of proving the underlying offenses. The full context of her statement is important:

> If you don't think we've proved beyond a
> reasonable doubt he's guilty of these crimes,
> you don't ever have to get to this, but we
> believe we did. We believe we met our burden.
> And if you believe likewise, we're gonna ask
> you to find the easy question, that he also had
> a deadly weapon.

¶ 28      Although the reference to the prosecution's "belief" was unnecessary and inartful, in context it is clear that the prosecutor was merely asserting that the evidence of Sellers's guilt was sufficient for the jury to reach the question of whether he possessed a deadly weapon. And, significantly, the prosecutor emphasized that it was the jury's job to decide this issue. Thus, we do not consider these statements "to have fallen to the level of improper expressions of the prosecutor's personal opinion." *Domingo-Gomez*, 125 P.3d at 1052.

¶ 29      We also disagree with Sellers that the prosecutor improperly vouched for the credibility of witnesses in her opening statement when she said,

15

> Now, I'm going to be up front with you. We had to make a deal with witnesses in order to get their truthful testimony. Now, we don't like doing that. And you probably don't like to hear that. But it is literally the only way we get an inside view of what happened that night. And I'm being up front with you so you know that.

¶ 30    In opening statement, a prosecutor is permitted to mention evidence that they believe in good faith will be admissible. *See People v. Lucero*, 714 P.2d 498, 503 (Colo. App. 1985) (citing 1 ABA, *Standards for Criminal Justice*, Standard 3-5.5 (2d ed. 1982)). The specifics of a plea agreement between the prosecution and a witness — including the requirement that the witness provide "truthful testimony" — is admissible, at least where the prosecutor does not express an opinion that the witness actually told the truth and there is no suggestion that the prosecutor possesses information unavailable to the jury. *People v. Coughlin*, 304 P.3d 575, 582-83 (Colo. App. 2011).

¶ 31    The plea agreement for one of the witnesses, which provides that the witness was agreeing to "testify truthfully," was admitted into evidence. Moreover, nothing in the prosecutor's statement amounted to an expression of the prosecutor's personal opinion

that the witness would in fact testify truthfully (as opposed to merely stating that the witness *agreed* to do so). Nor did the statement suggest that the prosecutor "appeared to possess information unavailable to the jury." *Id.* at 582. Thus, the prosecutor's statement about the plea agreement was proper.

¶ 32     In sum, we discern no prosecutorial misconduct and, thus, no error by the trial court in failing to intervene.[4]

## II.     Sellers's Attacks on His Sentence

¶ 33     Sellers levies two attacks on his sentence, the second of which has two alternative bases. He contends that the imposition of a consecutive sentence for his aggravated robbery conviction constitutes double jeopardy because, although the court did not address whether the sentence would be concurrent or consecutive to the felony murder sentence in its oral remarks, the mittimus later provided that it was consecutive. And he argues that his sentence to life without the possibility of parole for felony murder is

---

[4] Sellers contends that even if the purported instances of prosecutorial misconduct addressed in Part I.B of this opinion do not individually rise to reversible error, their cumulative prejudicial effect does. *See Howard-Walker v. People*, 2019 CO 69, ¶¶ 24-25. However, because we discern no error at all, there can be no cumulative error.

categorically or, alternatively, grossly disproportionate. We agree with his first contention but reject both aspects of his second.

## A. Consecutive Sentence

¶ 34     We review de novo whether a sentence is illegal. *People v. Chirinos-Raudales*, 2021 COA 37, ¶ 33 (*cert. granted* Dec. 20, 2021).

¶ 35     A court may not change a sentence from concurrent to consecutive after a defendant has begun serving it. *People v. Sandoval*, 974 P.2d 1012, 1015 (Colo. App. 1998). "Such an increase in the sentence is impermissible even if the court alters the sentence solely to conform to or clarify its original intent." *Id.* In *Sandoval*, a division of this court held that "where the trial court is advised of a pre-existing Colorado sentence but does not specify whether the new sentence is to be concurrent with or consecutive to the prior sentence, the new sentence will be presumed to run concurrently with the prior sentence." *Id.* However, no published Colorado case addresses whether this presumption of concurrency applies to contemporaneously announced sentences — rather than a pre-existing sentence and a new sentence — when the record is silent as to whether the defendant's sentences are to be concurrent or consecutive. Doing so for the first time, we conclude that it does.

18

¶ 36    In discussing the presumption of concurrency,[5] the division in *Sandoval* cited cases that applied a presumption of concurrency to sentences announced contemporaneously where the record was similarly silent. *Id.* at 1014-15.  For example, the division cited *Borum v. United States*, 409 F.2d 433, 440 (D.C. Cir. 1967), in which the court held that absent a specification of consecutiveness, multiple sentences operate concurrently whether they are pronounced contemporaneously or at different times or pertain to the same or different matters. *Sandoval*, 974 P.2d at 1014-15.  And the division noted that "[i]n *Graham v. Cooper*, 874 P.2d 390 (Colo. 1994), the [S]upreme [C]ourt cited federal cases applying the presumption of concurrency [for contemporaneous sentences], but found them inapplicable where the original sentence unambiguously imposed consecutive sentences." *Sandoval*, 974 P.2d at 1014.

---

[5] Although the division used the phrase "presumption of concurrency," *People v. Sandoval*, 974 P.2d 1012, 1015 (Colo. App. 1998), the presumption goes to whether the sentences imposed were to run concurrently.  The term is not intended to suggest that there is an evidentiary presumption that must be overcome before a sentencing court may exercise its discretion to impose a consecutive sentence.

¶ 37    We see no reason why, where the record is silent, a

presumption that the court intended to impose concurrent

sentences would not apply when the trial court contemporaneously

sentences the defendant on more than one offense.  "Sentences in

criminal cases should reveal with fair certainty the intent of the

court and exclude any serious misapprehensions by those who

must execute them."  *Id.* at 1015.  "Adopting a presumption of

concurrency comports with 'the general notion of holding the

Government to precision before a defendant can be jailed,' and

requires that the prosecution and the court affirmatively suggest

and impose consecutive sentences if such are intended."  *Id.*

(quoting *United States v. Wenger*, 457 F.2d 1082, 1084 (2d Cir.

1972)).

¶ 38    As noted, the trial court did not say during the sentencing

hearing that the sentence for aggravated robbery would be

consecutive to the sentence for felony murder.  Of course, the

courts need not specifically use the word "consecutive."  *See, e.g.*,

*Graham*, 874 P.2d at 394 (noting that the transcript of the

sentencing proceeding unambiguously reflected a consecutive

sentence, in part because the court said the aggregate sentences

would "total '80 years'"). But we do not view the court's sentencing pronouncement as unambiguously indicating such an intent.

¶ 39 At the sentencing hearing, the trial court merged the five convictions related to the victim who was killed, entering a single conviction for felony murder, and sentenced Sellers to life without the possibility of parole in the custody of the Department of Corrections. Regarding his sentence for the aggravated robbery of the other victim, the trial court said,

> I do find that Count 13, the [aggravated robbery] conviction, is a separate offense. It's further supported by a proven crime of violence sentencing enhancer. The Court finds that the maximum sentence of 32 years in the Department of Corrections, followed by a five-year period of parole, for Count 13 reflects the serious violent nature of the event as the Court heard the evidence and reflects the jury's verdict. It is an aggravated robbery.

¶ 40 Contrary to the People's contention, the trial court's language does not evince an intent to impose a consecutive sentence. Rather, the trial court had just explained that the other convictions merged into the felony murder conviction, and its statements about the aggravated robbery conviction and sentence being for a separate

21

offense explained why that conviction was not merged into the felony murder conviction.

¶ 41    Accordingly, applying the presumption of concurrency, we conclude that the court's oral pronouncement imposed concurrent sentences.  Thus, the trial court impermissibly increased Sellers's sentence when, after Sellers had already begun serving his sentence, it issued the mittimus providing that Sellers's aggravated robbery sentence would run consecutively to his felony murder sentence.

## B.    Eighth Amendment Challenges

¶ 42    Embodied in the Eighth Amendment is the principle that punishment for a crime must be proportionate to the offense.  *Graham v. Florida*, 560 U.S. 48, 59 (2010).  There are two types of Eighth Amendment challenges to sentences: (1) challenges to the excessiveness of a particular punishment for a particular offender, and (2) categorical challenges to sentences imposed based on the "nature of the offense" or the "characteristics of the offender."  *See id.* at 59-61; *see also People in Interest of T.B.*, 2021 CO 59, ¶ 27.

¶ 43    Sellers contends that a sentence of life without the possibility of parole for felony murder is categorically unconstitutional; in the

alternative, he contends that we should remand the case to the trial court to conduct a proportionality review. We disagree that the categorical approach is applicable. And because the record is sufficient for us to do so, we conduct an abbreviated proportionality review and conclude that Sellers's sentence is proportional. *See People v. Cooper*, 205 P.3d 475, 480 (Colo. App. 2008) ("Only when an extended proportionality review is required must an appellate court remand."), *abrogated on other grounds by Scott v. People*, 2017 CO 16.

### 1. The Statutory Amendment

¶ 44      Sellers committed his offense on October 7, 2018. At that time, felony murder was a class 1 felony. § 18-3-102(1)(b), C.R.S. 2018. As such, the minimum sentence was life in prison without the possibility of parole. § 18-1.3-401(1)(a)(V)(A.1), (4)(a), C.R.S. 2018.

¶ 45      In 2021, the General Assembly reclassified felony murder as a class 2 felony. Ch. 58, sec. 2, § 18-3-103, 2021 Colo. Sess. Laws 236. As a result, the maximum length of a sentence for this offense was lowered to forty-eight years. § 18-1.3-401(1)(a)(V)(A.1), (8)(a)(I), C.R.S. 2021. The General Assembly explicitly provided that the

reclassification only applies to offenses committed on or after September 15, 2021. Ch. 58, sec. 6, 2021 Colo. Sess. Laws at 238.

### 2. Categorical Challenge

¶ 46 Sellers contends that a sentence of life without the possibility of parole for felony murder is categorically unconstitutional, in large part because of the subsequent legislative amendments to the classification of and penalty for felony murder. We disagree because the categorical approach is inapplicable.

### a. Standard of Review and Applicable Law

¶ 47 We review de novo the constitutionality of statutes. *T.B.*, ¶ 25.

¶ 48 Eighth Amendment challenges to criminal sentences usually involve "comparing the gravity of the offense and the severity of the sentence." *Graham*, 560 U.S. at 60. However, on a few occasions, the Supreme Court has "used categorical rules to define Eighth Amendment standards." *Id.*

¶ 49 Cases adopting categorical rules under the Eighth Amendment employ a two-part test. *Id.* at 61. First, we look to "'objective indicia of society's standards' . . . to determine whether there is a national consensus against the sentencing practice at issue." *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 572 (2005)). Then we

"determine in the exercise of [our] own independent judgment whether the punishment in question violates the Constitution." *Id.*

### b. Analysis

¶ 50 Until *Graham,* the only cases in which the Supreme Court had used the categorical approach involved a determination that the death penalty was impermissible for certain offenses or certain types of offenders. *Id.* at 60; *see also Coker v. Georgia,* 433 U.S. 584, 593-96 (1977) (defendants convicted of sexual assault where the victim did not die); *Enmund v. Florida,* 458 U.S. 782, 789-93 (1982) (defendants convicted of felony murder but who did not actively participate in the use of lethal force); *Ford v. Wainwright,* 477 U.S. 399, 409 (1986) (defendants who are insane); *Atkins v. Virginia,* 536 U.S. 304, 313-21 (2002) (defendants with cognitive disabilities); *Roper,* 543 U.S. at 568 (juvenile offenders); *Kennedy v. Louisiana,* 554 U.S. 407, 421 (2008) (defendants convicted of sexual offense against a child where death neither occurred nor was intended).

¶ 51 In *Graham,* the Supreme Court applied the categorical approach in holding that the Eighth Amendment prohibits the imposition of a life sentence without the possibility of parole on a

juvenile offender who did not commit homicide. 560 U.S. at 61-62, 82. Then in *Miller v. Alabama*, 567 U.S. 460, 476 (2012), the Supreme Court held that even for homicide offenses, a juvenile may not be subject to a *mandatory* sentence of life without the possibility of parole, and that the sentencing authority must take into account the mitigating qualities of "an offender's age and the wealth of characteristics and circumstances attendant to it."

¶ 52      *Graham* categorically prohibited a certain punishment for certain offenses involving juveniles — namely, life without the possibility of parole for nonhomicide offenses. Contrary to Sellers's argument, however, in *Miller*, the Supreme Court explicitly said that its decision "does not categorically bar a penalty for a class of offenders or type of crime." 567 U.S. at 483. Rather, "it mandates only that a sentencer follow a certain process — considering an offender's youth and attendant characteristics — before imposing a particular penalty." *Id.*[6]

---

[6] In the wake of *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court's handling of this qualifying language has been inconsistent. *Compare Montgomery v. Louisiana*, 577 U.S. 190, 201-04 (2016) (treating the rule announced in *Miller* as akin to a "categorical constitutional guarantee[]," and thus a substantive rule

¶ 53    Significantly, however, in neither case did the Supreme Court hold or even suggest that the categorical approach should be applied to a life-without-parole sentence imposed on an adult in a homicide offense.  To the contrary, the Supreme Court noted in *Graham* that "defendants who do not kill, intend to kill, *or foresee that life will be taken* are categorically less deserving of the most serious forms of punishment than are murderers."  560 U.S. at 69 (emphasis added).  And in *Miller*, the Supreme Court noted that "children are constitutionally different from adults for purposes of sentencing."  567 U.S. at 471.

¶ 54    Sellers cites no case — and we are aware of none — extending the categorical approach to cases not involving the death penalty or juvenile offenders.  In fact, the Supreme Court has upheld a life-without-parole sentence for an adult offender — even in a nonhomicide case.  *Harmelin v. Michigan*, 501 U.S. 957 (1991) (possession of over 650 grams of cocaine).  And the Supreme Court

---

to be applied retroactively to cases already final), *with Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1316 (2021) (reiterating the description of *Miller* as noncategorical and noting that "*Montgomery* did not purport to add to *Miller*'s requirements").  Thus, it appears that the Supreme Court's characterization of the decision in *Miller* as noncategorical remains accurate.

in *Miller* unequivocally clarified that it was not overruling *Harmelin*. *Miller*, 567 U.S. at 482. Thus, because neither the Supreme Court nor, apparently, any other appellate court in the nation has applied the categorical analysis to cases not involving either the death penalty or juvenile offenders, we decline to do so.

### 3. Proportionality of Sellers's Sentence

¶ 55 We also reject Sellers's alternative request to remand for an abbreviated proportionality review. Instead, conducting that review ourselves, we conclude that the sentence is not unconstitutionally disproportionate despite subsequent legislative amendments to the sentencing range for felony murder.

### a. Preservation and Standard of Review

¶ 56 To the extent the People contend that Sellers's proportionality challenge was not preserved because he did not request a proportionality review, we need not resolve this issue because, reviewing de novo whether the sentence is grossly disproportionate, *see Wells-Yates v. People*, 2019 CO 90M, ¶ 35, we perceive no error.

### b. Applicable Law

¶ 57 A sentence that is grossly disproportionate to the crime is unconstitutional. *Wells-Yates*, ¶ 5 (citing *Harmelin*, 501 U.S. at

28

1001 (Kennedy, J., concurring in part and concurring in the judgment)). While most proportionality challenges occur in habitual criminal cases, the same principles apply in nonhabitual cases. *See People v. Smith*, 848 P.2d 365, 374 (Colo. 1993).

¶ 58     To determine whether a sentence is grossly disproportionate, the court conducts a two-step analysis. *Wells-Yates*, ¶ 10. First, the sentencing court conducts an abbreviated proportionality review. *Id.* at ¶¶ 11-14. And second, if necessary, it conducts an extended proportionality review. *Id.* at ¶ 15. In an abbreviated proportionality review, the court compares the gravity and seriousness of the offense with the harshness of the sentence. *Valenzuela v. People*, 856 P.2d 805, 809 (Colo. 1993); *see also Wells-Yates*, ¶¶ 7, 10. This analysis generally requires a consideration of the facts and circumstances underlying the defendant's conviction. *People v. Session*, 2020 COA 158, ¶ 36.

¶ 59     Certain crimes have been designated per se grave or serious offenses. *Wells-Yates*, ¶ 13. "For these crimes, . . . a trial court may skip the first subpart of step one — the determination regarding the gravity or seriousness of the crimes . . . ." *Id.* A crime should not be designated per se grave or serious unless, based on

the statutory elements and in every potential factual scenario, it involves grave or serious conduct. *Id.* at ¶¶ 63-64 (explaining, for example, that robbery is a per se grave or serious offense).

¶ 60 Even when the offense is per se grave or serious, "it would be improper for a court to skip the second subpart of an abbreviated proportionality review and neglect to consider the harshness of the penalty." *Id.* at ¶ 27. Our determination of the harshness of the penalty takes into account parole eligibility. *Id.* at ¶ 14.

### c. Analysis

¶ 61 Sellers argues that the 2021 statutory amendment should be considered when assessing the proportionality of his sentence. True, our supreme court in *Wells-Yates* observed that even statutory amendments that apply only to future offenses should nevertheless be considered "as objective indicia of the evolving standards of decency to determine the gravity or seriousness of the triggering offense." *Wells-Yates*, ¶ 47. But the court also acknowledged that such an amendment is "not determinative." *Id.* at ¶ 50.

¶ 62 Initially, we note that even after the statutory amendment, the legislature has still made clear that it considers felony murder a

30

serious matter. Indeed, the legislature classified felony murder as second degree murder, a class 2 felony. Thus, while the General Assembly has (prospectively) significantly lowered the sentencing range for such acts, the amendment cannot be seen as a signal that the "evolving standards of decency" reflected by the statute no longer consider felony murder to be grave or serious.

¶ 63     No Colorado appellate court has yet addressed whether felony murder is per se grave or serious. We now consider that question and conclude that it is.

¶ 64     A person commits felony murder when,

> [a]cting either alone or with one or more persons, he or she commits or attempts to commit felony arson, robbery, burglary, kidnapping, sexual assault as prohibited by section 18-3-402, sexual assault in the first or second degree as prohibited by section 18-3-402 or 18-3-403, as those sections existed prior to July 1, 2000, or a class 3 felony for sexual assault on a child as provided in section 18-3-405(2), or the felony crime of escape as provided in section 18-8-208, and, in the course of or in furtherance of the crime that he or she is committing or attempting to commit, or of immediate flight therefrom, the death of a person, other than one of the participants, is caused by any participant.

§ 18-3-103(1)(b), C.R.S. 2021.

¶ 65 Felony murder is a per se grave or serious offense because it necessarily involves committing a violent predicate felony that results in the death of a person. Thus, every factual scenario giving rise to a charge of felony murder will be grave or serious. *See Wells-Yates*, ¶¶ 63-64; *People v. Mandez*, 997 P.2d 1254, 1273 (Colo. App. 1999) (agreeing with the trial court that "felony murder is a serious crime"); *Smith*, 848 P.2d at 374 (noting that felony murder is a crime of "the utmost gravity"). Notably, the legislature has also defined it as a per se crime of violence and an extraordinary risk crime. § 18-3-103(4); § 18-1.3-406(2)(a)(II)(B), C.R.S. 2021. At least one division of this court has considered a crime's classification as a per se crime of violence as support for the conclusion that the crime is also per se grave or serious. *People v. Gee*, 2015 COA 151, ¶ 37.

¶ 66 In sum, nothing in the statutory reclassification of felony murder suggests that the legislature no longer considers felony murder to be grave or serious.

¶ 67 As to the harshness of the penalty, we conclude that his life sentence is not grossly disproportionate. While we recognize that this life sentence is potentially substantially longer than the

maximum forty-eight years a defendant in Sellers's shoes could receive under the amended statute, and that Sellers is not eligible for parole, those differences do not mean that the sentence is grossly disproportionate. *See Mandez*, 997 P.2d at 1273 (concluding that a life sentence without parole for felony murder was not grossly disproportionate). Thus, we conclude that Sellers's sentence is not grossly disproportionate.

### III. Disposition

¶ 68    We affirm the convictions and the sentence for felony murder but vacate the consecutive sentence for aggravated robbery and remand to the trial court with instructions to impose a concurrent sentence.

JUDGE DAILEY and JUDGE HAWTHORNE concur.